IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MASSTECH COMMUNICATIONS, INC.,

            Plaintiff,

      v.                            CIVIL ACTION NO.

ROBERT CURRAN,

            Defendant.

04cv10604

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I. INTRODUCTION

Having discovered that defendant and recently terminated employee Robert Curran ("Curran") has stolen plaintiff's confidential information and is now selling it over the Internet as his own work -- and apparently did the same for almost a year as plaintiff's employee -- plaintiff MassTech Communications, Inc. ("MTC") now faces a particularly urgent situation. MTC seeks injunctive relief to prevent the continued theft of its product.

### II. FACTS[1]

Plaintiff MTC publishes Mass High Tech, a weekly subscriber-based journal that concerns and serves the rapidly growing technology industries in New England.

---

[1] All facts recited here are drawn from the Verified Complaint.

MTC's ultimate parent is American City Business Journals, Inc. ("ACBJ"), which publishes a variety of business newspapers and periodicals across the country.

In addition to publishing Mass High Tech, MTC has developed a proprietary database of information, comprised of a listing of high tech companies in the New England area and key personnel at those companies (the "Database"). The Database currently contains approximately 9,000 companies and contact information for more than 40,000 executives. The Database required years of work and substantial cost to develop. It took three years for MTC to grow the database from 7,000 companies to the just under 9,000 it contains today. The Database is continually updated and thus is an ongoing investment of MTC. Curran did not contribute to the creation or maintenance of the Database.

In addition to the raw information in the Database, MTC has taken steps to make the directory more useful and accessible to its customers. Originally, the directory information was published in book and CD-ROM form, and MTC continues to sell those forms of the directory. In 1999, however, MTC hired a team of programmers to develop a web-based version of the Database that could be searched and reviewed over the Internet. It took six months for the team to develop the necessary software to permit Internet access to the Database. MTC also developed software to permit searching the directory, both on the CD-ROM and via the Internet. In 2002, MTC again hired programmers to develop a read-only version of its web-based product for sales to libraries and other entities.

To protect its confidential information, MTC has adopted a "conflict of interest" policy that governs not only conflicts of interest but ensures confidentiality of its proprietary information (the "Policy"). The policy was created by ACBJ and is used by ACBJ subsidiaries. A copy of the Policy is attached to the Verified Complaint as Exhibit A. MTC employees are required physically to sign a copy of the Policy when

they are hired, and annually to reaffirm in writing their understanding of and agreement to comply with the Policy.

### MTC Hires Curran

On April 20, 2000, MTC hired Curran as a sales person with responsibility for selling the Database and print directories. As MTC consistently requires, Curran signed a copy of the Policy. His signatures on various documents accepting and agreeing to comply with the Policy are attached to the Verified Complaint as Exhibit B. No part of Curran's duties involved adding to or soliciting names for the Database, nor has he in fact done so.

Curran agreed that he would "not use, directly or indirectly, for [his] own or any other person's financial gain, any information about [ACBJ] which the employee obtained in connection with ABCJ employment." Ex. B at 1. He also agreed that "all material gleaned by [him] in the course of [his] work for ACBJ is deemed to be strictly the Company's property." Id.

### Curran Unlawfully Accesses MTC's Computer System, Willfully Breaches His Agreements With MTC and Steals the Company's Property

Unbeknownst to MTC, on information and belief, Curran began violating his agreements and defrauding MTC by selling the Database for his own account. In April 2003, or earlier, Curran established an Internet site on the World Wide Web at the address http://www.dsdirect.com. MTC believes that Curran has sold the Database from the dsdirect.com website since April 2003, or earlier.

Shortly after the beginning of 2004, Kai Schulze, an account executive at MTC who had been hired in December 2003, noticed that contact information for customers who had purchased a directory product in the previous year had been deleted from MTC's records. MTC confronted Curran about the deletions, and he admitted that he had deleted the records, thereby depriving MTC of information about those customers.

In addition to deleting customers from MTC's records, Curran appears to have taken steps to divert customers from MTC in the first place. At the end of each calendar year, MTC sends a direct mail solicitation to past and potential customers of the Database and the other MTC directory products, in advance of a new edition of the directory that is generally published in January. That solicitation reliably produces a substantial number of sales. In the direct mail solicitation sent in late 2003, potential customers were invited to call Curran. MTC received no contacts from the 2003 solicitation.

On March 15, 2004, MTC terminated Curran's at-will employment for lack of productivity in sales and failure to work assigned hours. MTC did not then know about Curran's theft of the Database or the existence of the dsdirect.com website.

After Curran's termination, Schulze took over responsibility for receiving customer responses to the direct-mail solicitation. Calls instantly increased, and MTC sold approximately $10,000 in directory products the week after Curran's termination.

On March 25, 2004, a customer of MTC's who had purchased the print directory in the past, contacted Schulze and told him that Curran had contacted the customer about purchasing a database of New England High Tech companies from dsdirect.com. The customer was suspicious because the product Curran was offering sounded so similar to MTC's product.

Schulze then visited the dsdirect.com website and noted a number of similarities between the database offered there and MTC's Database. (For the Court's reference, true and correct copies of pages from that website, as displayed on March 26, 2004, are attached to the Verified Complaint as Exhibit C).

For example, the dsdirect.com website offers a database of "business technology companies" in New England, and permits customers to choose a database of manufacturing companies only, software companies only, or both. MTC's Database is

similarly divided between manufacturing and software companies, for historical reasons related to the method by which the Database was developed.

Curran's dsdirect.com site similarly describes its database as offering "over 9,300 companies and over 26,000 contacts throughout New England," as compared to MTC's Database, which contains (and is advertised as containing) approximately 9,000 companies and 40,000 contacts. Curran also offers the database at the same or similar price as MTC's Database. Curran's site also offers the capability to search the database over the Internet.

Investigating further, MTC learned through publicly available information that the dsdirect.com website had been created in April 2003. Documents showing the connection to Curran and the place of business that he advertises at dsidirect.com are attached to the Verified Complaint as Exhibit D. Among other things, the information connects dsdirect.com with Kevin Curran, whom MTC understands to be defendant Robert Curran's brother.

Reviewing its sales figures of the Database during 2003, and year-over-year sales data comparing 2002 to 2003, MTC noticed that its sales of the Database in January, February, and March 2003 were comparable to the same months in 2002, but that sales began to dip in April 2003 and fell off dramatically thereafter -- just as dsdirect.com came into existence.

### III. ARGUMENT

*A.  Standard for Relief*

In determining whether to issue a temporary restraining order ("TRO") or a preliminary injunction pursuant to Fed. R. Civ. P. 65, courts will consider the likelihood of success on the merits, the risk of irreparable harm to the moving party if the TRO or injunction is not issued, the balance of equities and the public interest. *Langlois v. Abington Housing Authority*, 207 F.3d 43, 47 (1st Cir. 2000).

*B.  MTC is Entitled to an Injunction*

(i)     MTC is Likely to Prevail on the Merits

1.      The Computer Fraud and Abuse Act. There can be no question that Curran has stolen MTC's Database, as well as the search software, the code necessary to permit display and search of the Database over the Internet, and other confidential and proprietary information of MTC. The Database took many years to develop, and the Internet capability took a team of programmers months to develop. Curran holds no license for any of this data or technology, and could not possibly have developed it in the two weeks since he was terminated. He has stolen MTC's property and is now selling it as his own. He has done exactly what the Computer Fraud and Abuse Act ("CFAA") prohibits: he accessed a computer that is used in interstate commerce or communication and obtained information, 18 U.S.C. 1030(a)(2), and knowingly and with intent to defraud, accessed a protected computer and thereby furthered his fraud and obtained things of value -- the Database, the search code, customer names, and the like. 18 U.S.C. §1030(a)(4).

The improper access here is far more egregious than other conduct that the First Circuit has held to violate the CFAA. For example, in *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577 (2001), the defendant used a "scraper" software program to collect pricing information from a competitor's web site. The pricing information collected was available to the general public, although accompanied by tour codes that were only meaningful to those with knowledge of the plaintiff's practices. *Id.* at 579. The district court granted a preliminary injunction, reasoning that the collection of the information, although available to the public, exceeded the plaintiff's "reasonable expectations" of how the information would be used. *Id.* at 580.

Here, in contrast, Curran accessed MTC's computers to collect decidedly nonpublic information for the purpose of reselling it as his own. He stole the Database, or substantial parts of it, and appears also to have stolen the computer code necessary to make the Database accessible over the Internet and that permits users to

search the Database for specific information. MTC is likely to demonstrate that Curran knowingly accessed a protected computer with intent to defraud and obtained a thing of value in furtherance of that scheme, within the meaning of 18 U.S.C. §1030(a)(4), or at a minimum that he improperly accessed a protected computer and retrieved information within the meaning of 18 U.S.C. §1030(a)(2), and in either case that MTC has suffered a loss within the meaning of 18 U.S.C. §1030(g).

2. <u>State Law Claims</u>. MTC is also likely to succeed on its state law claims. MTC took steps to protect its property, including requiring Curran specifically to agree not to use MTC's property for his personal gain, but even absent any contract, MTC's trade secrets are protected against wholesale theft as a matter of public policy. *See, e.g., Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 167-68 (1979); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 299 (D. Mass. 1995); *see also Atlantic Wool Combing Co. v. Norfolk Mills, Inc.*, 357 F.2d 866, 869 (1st Cir. 1966) ("the essence of the wrong is the obtaining of unjust enrichment and unfair competitive advantage through inequitable conduct, usually a breach of confidence").

Massachusetts' definition of trade secrets is broad, extending to "any formula, pattern, devise or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970) (citing Restatement of Torts §757, comment b). The information Curran has stolen from MTC falls well within that definition; the Database itself os a valuable "compilation of information" that confers a competitive advantage on MTC, and the computer code permitting searching and viewing of the Database over the Internet similarly confers a competitive advantage even were Curran to develop his own database.

In any case, the employee's general duty not to disclose confidential information belonging to his employer protects not only traditional trade secrets, but a broader

category of proprietary information. *See, e.g., Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 169 (1991) (certain business information which does not rise to the level of trade secrets nevertheless is protectible based on the employee's duty not to disclose the employer's confidences); *American Window Cleaning Co. of Springfield v. Cohen*, 343 Mass. 195, 201 (1961) (use of knowledge of a business relationship between former employer and potential customer to interfere with that relationship constituted unfair conduct); *In re Uniservices, Inc.*, 517 F.2d 492, 496 (7th Cir. 1975) (fact that some portion of information misappropriated by former employee was public did not eviscerate duty of loyalty).

MTC is likely to prevail on the merits of its claims, and an injunction should issue.

### (ii) Plaintiff Has No Adequate Remedy at Law and Will be Irreparably Harmed Unless an Injunction Issues

At the outset, the First Circuit affirmed entry of a preliminary injunction in *EF Cultural Travel* without an express showing of irreparable harm, concluding that the demonstrated likelihood of success on the merits on the CFAA claim was sufficient to support the injunction. 274 F.3d at 585. In any case, MTC's irreparable injury is also manifest. For almost a year, Curran has been approaching MTC's past and potential customers to sell them a Database that belongs to MTC, but presenting it as his own product -- thereby stealing not only money that rightfully belongs to the owner of the Database, but also the goodwill that such sales would generate for MTC. That alone is an irreparable injury. *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 827 (D. Mass. 1990) ("as to any unknown or future violations of the covenants by defendants, [plaintiff's] loss of 'goodwill' is irreparable"). Absent an injunction, Curran will be able to compound the irreparable harm he has already inflicted by approaching more customers.

Second, it appears that Curran is using a customer list of MTC's to approach MTC's existing customers and sell them his database. See, e.g., Verified Complaint ¶13. The harm to MTC caused by further use of its customer list and possible resultant loss of business could be impossible to measure. *See Kroeger v. Stop & Shop Cos., Inc.*, 13 Mass. App. Ct. 310, 322 ("the task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one"). Even absent an express noncompetition agreement here, the task of quantifying the harm will be no less difficult. The fundamental purpose of a preliminary injunction is to prevent harm from occurring. That harm is nearly certain in light of Curran's past conduct. An injunction will "minimize the 'harm that final relief cannot redress,' by creating or preserving, insofar as possible, a state of affairs such that after the full trial, a meaningful decision may be rendered for either party." *Brookline v. Goldstein*, 388 Mass. 443, 447 (1980) (*quoting* Leubsdorf, *The Standard for Preliminary Injunctions*, 91 Harv. L. Rev. 525, 541 (1978)); *see also Shipley Co., L.L.C. v. Kozlowski*, 926 F. Supp. 28, 29 (D. Mass. 1996) ("If confidential information is allowed to be revealed, the damage will have already occurred," and there will be no way to assess plaintiff's losses).

Third, Curran was MTC's sole salesperson with respect to the Database. He was in a very real sense the public "face" of MTC in database sales, and he now is capitalizing on those relationships, developed while he was employed at MTC and at MTC's expense, to sell MTC's own product for his personal gain. His misuse of those customer relationships constitutes a further misappropriation of MTC's goodwill that cannot be compensated in damages.

    (iii)    <u>A Balancing of the Equities Favors Entry of an Injunction</u>

The tip in the balance of equities here could not be more decisive: there are no equities at all in Curran's position. He is selling a product he stole from his former

employer and to which he has no right -- a product that he apparently has been selling for his own account for months. That blatant misconduct must be stopped.

        (iv)    The Public Interest Favors an Injunction.

The "public interest is not adversely affected by the protection of [an employer's] confidential information." *C.F. Bard, Inc. v. Intoccia,* 1994 WL 601944 at *3 (D. Mass. 1994); *see also Jet Spray Cooler, Inc.,* 377 Mass. at 166-67 1979) ("The protection we afford trade secrets against one who wrongfully uses them is grounded on principles of public policy . . . ."). Companies cannot be expected to devote resources to improving their products if their work is to be for sale by any disgruntled former employee. The public interest favors the issuance of an injunction in this case.

## IV. CONCLUSION

For the foregoing reasons, the Motion for *Ex Parte* Temporary Restraining Order should be allowed.

        Respectfully Submitted,

        **MASSTECH COMMUNICATIONS, INC.**

        By its attorneys,

        */s/ Mark W. Batten*
        Mark W. Batten, BBO #566211
        BINGHAM McCUTCHEN LLP
        150 Federal Street
        Boston, MA 02110
        (617) 951-8000

Dated: March 29, 2004