IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| MASSTECH COMMUNICATIONS, INC., ) | CIVIL ACTION |
| ) | NO.  04 CV 10604 NG |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **DEFENDANTS' OPPOSITION** |
| ROBERT CURRAN, KEVIN CURRAN ) | **TO PLAINTIFF'S MOTION** |
| and THE MARKETPLACE GROUP, INC. ) | **FOR JUDGMENT** |
| ) | **AND REQUEST FOR ORAL** |
| Defendants. ) | **ARGUMENT** |
| ) | |

---

Defendants Robert Curran, Kevin Curran, and The Marketplace Group, Inc. oppose Plaintiff's Motion for Judgment for the reasons set forth below.  Defendants separately move for Declaratory Relief with respect to the Settlement Agreement between the parties and any Injunctive order this Court may issue, in a motion filed herewith.

It is imperative that this Court deny MassTech's Motion for Judgment, because the Settlement Agreement is unconscionable and unenforceable.  The Settlement Agreement is ambiguous and calls for court action in the form of a permanent injunction.  A permanent injunction is inappropriate here and if one is entered, it must be narrowly tailored to protect proven legitimate interests of Plaintiff.  The Agreement contains terms that are against well-established public policy.  The Agreement also appears to be a per se violation of the Sherman Act.  It would work a wrong to transform the present injunction into a permanent injunction that could effectively bar Defendants, including one

defendant not actually subject to the Preliminary Injunction in this case, from conducting any number of businesses, regardless of whether such activity actionably harms Plaintiff.

## I. Outline of Facts

Defendant Robert Curran ("Curran") was a salesman employed by plaintiff MassTech Communications, Inc. ("MassTech") to sell a database and print directory developed by MassTech. (Plaintiff's Amended Complaint Para. 11). MassTech hired Curran on April 20, 2000. Id. On March 15, 2004, MassTech terminated Curran's employment for lack of productivity in sales and failure to work assigned hours. (Plaintiff's Amended Complaint Para. 18). MassTech erroneously asserts in its Motion for Judgment that Curran was terminated "after MassTech learned that Curran had been attempting to sell MassTech's database[.]" (Plaintiff's Motion for Judgment). Although MassTech's Motion for Judgment states that these "facts" are taken from the Verified Complaint, neither the Verified Complaint or the Amended Complaint even allege that this was the reason for Curran's termination. Both of those pleadings refer to Curran being terminated for performance related reasons. As it has throughout these proceedings, MassTech continues to confuse allegation with fact, and bad faith with healthy free-market competition.

While employed by MassTech, Curran signed an acknowledgement that he had read, understood, and would abide by a Conflict of Interest Policy (Amended Complaint at Tab B) and the Employee Handbook and Guidelines. (Plaintiff's Amended Complaint Tab B). Contrary to MassTech's claim that it attached "[a] true copy of the Policy bearing Curran's signature…" to the Amended Complaint, this is simply not so.  No signed Policy itself is attached. There is no way to know what Policy was acknowledged by Bob

Curran.  Certainly it cannot be the Policy attached as Tab A, as that Policy is dated after Bob Curran's termination for poor performance.

Even if the date of the Policy at Tab A simply reflects when the document was printed, the attached version has a clickwrap acknowledgement, not a hand-written signature page. There is no evidence that Bob ever "clicked" his acknowledgement. MassTech has also failed to support the authenticity of the Policy with any affidavits or declarations. Moreover, MassTech has failed to include a copy of the referenced Employee Handbook and Guidelines.

On March 29, 2004, MassTech filed a Verified Complaint alleging various claims against Robert Curran. (See Plaintiff's Verified Complaint). On March 30, 2004, this Court granted a Temporary Restraining Order ("TRO") against Robert Curran. (See Temporary Restraining Order). The TRO expired on April 12, 2004. Id.

On April 12, 2004, MassTech filed an Amended Complaint, adding as defendants Curran's brother Kevin Curran and The Marketplace Group, Inc. (See Amended Complaint). On April 13, 2004, this Court entered a Preliminary Injunction ("P.I.") against Robert Curran only. (See P.I.). The Order is mistakenly dated April 13, 2003.

The defendants filed a timely answer to the Amended Complaint, denying the allegations made by MassTech. (See Answer to Amended Complaint). On October 20, 2004, shortly after the commencement of discovery, the parties entered into a settlement agreement (the "Settlement Agreement"). (Plaintiff's Motion for Judgment p.2). Defendants signed the Settlement Agreement, but it required further action by this Court, namely, the entry of an order making the P.I. permanent and expansion of the injunction also to cover Kevin Curran. (See Plaintiff's Motion for Judgment, Tab A).  Plaintiff's

counsel wrote to Magistrate Judge Bowler on October 20, 2004, describing the settlement as follows:  the parties "have reached a conditional agreement in principle to settle the case . . . . The tentative settlement will also require entry of a permanent injunction, rather than a dismissal, on terms that the parties will present to the Court in an agreement for judgment . . . I cannot yet say that the parties will have no need of assistance from the Court in seeing this case through to its conclusion . . . ." (at Docket Number 13).

The Settlement Agreement also required that the defendants turn over sensitive financial records to MassTech, make supplemental payments to account for profits, if any, made by defendants with regard to the sale of MassTech's database, and pay MassTech's legal fees in the amount of twelve thousand dollars ($12,000.00). Id.

The defendants paid MassTech the twelve thousand dollars for their legal fees. (Plaintiff's Motion for Judgment p.2). Defendants also provided MassTech with the required financial records. Id. After receiving the financial records, MassTech did not require defendants to make any supplemental payments. Id.

Although the Settlement Agreement had been executed, the parties continued to negotiate a certain portion of the Settlement Agreement, including that portion making the P.I. permanent.  The parties discussed the meaning of the language in the P.I. throughout the summer of 2005. Counsel for MassTech explained directly to Kevin Curran the limitations of the P.I.  Unfortunately, these explanations were contrary to the plain language of the P.I.

On July 25, 2005, this Court held a settlement conference.  The Court ordered the parties to "try to negotiate for a (2) two year limit on paragraph (3) of the preliminary injunction, all other terms of the settlement agreement to remain. If necessary, counsel

shall contact clerk for a further settlement conference." (Electronic Clerk's Notes for proceedings held before Judge Nancy Gertner).

Subsequent to the July 25, 2005 settlement conference, the parties attempted to resolve the issue of a limitation on paragraph three of the P.I. The parties also considered having another settlement conference with the Court. MassTech was unwilling to take the suggestion of this Court, and on November 28, 2005, filed a Motion for Judgment.

MassTech's Motion for Judgment states that "defendants have refused to comply with the plain, unambiguous terms of the [settlement] agreement[.]" The settlement agreement on its face incorporates the P.I. And the P.I. contains no restriction as to context, meaning that the non-solicit clause is not solely related to the database industry. MassTech claims that the non-solicitation clause does not affect the Currans' employment. (Plaintiff's Motion for Judgment p.3). Without knowing whom they can and cannot contact, regardless of context, the Currans face the perpetual threat of suit if they solicit MassTech's customers or contacts in any field. Moreover, it must be made clear that the Currans are free to independently gather publicly available informational, and that this information may overlap with the data contained in MassTech's product. Though counsel for MassTech has represented that independent data collection would be permitted, it is not clear from the plain language of the P.I.

MassTech's Motion for Judgment alleges that "Curran also deleted customer records from MassTech's computers." (Plaintiff's Motion for Judgment Page 2). Curran denies this baseless allegation and MassTech has provided no evidence of its claim. The record is completely lacking in even an affidavit in support of this claim.

The Motion also states that the P.I. "forbade the defendants from (a) further use or dissemination of MassTech's confidential information; (b) altering data on computer or data storage devices; or (c) soliciting MassTech's customers." This statement is incorrect for a variety of reasons, namely, (1) the PI only applied to Curran, not to The Marketplace Group, Inc. (hereinafter, "Marketplace") or Kevin Curran, and (2) section (a) of the P.I. actually restricts Curran "from further use or dissemination of any database, customer list, or other confidential information and/or trade secret of [MassTech]."

## II.   Argument

### A.   Only this Court can issue an Injunctive Order and Court Must not Issue an Injunction unless it finds Plaintiff has met all requirements for an injunction.

### 1.   The Preliminary Injunction cannot simply be contractually transformed into a Permanent Injunction without the Court's careful analysis

The Settlement Agreement's provision making the preliminary injunction permanent is not enforceable.   It is self-evident that only the court may issue court orders.  The parties may not bind the court to issue an order that is improper, unsupported or unreasonable.  Merrill Lynch v. Bennert, 980 F.Supp. 73 (D.Me. 1997).   It is obvious that the Settlement Agreement is not fully integrated, since this court must first carefully consider whether to enter a permanent injunction and, if it so chooses, the terms of such order.  While it is true that the defendants signed the settlement agreement, they had good reason to believe that other key terms were still being negotiated between the parties. Defendants believed that by entering in to the Settlement Agreement, they were resolving the litigation.  However, by its nature the P.I., by becoming permanent, fundamentally does not end the case, but instead makes any "contact" a defendant makes a potential

grounds for contempt. The language of the order, if made permanent, effectually bars the Curran defendants from conducting any business that may remotely overlaps with Plaintiff's business. The settlement agreement itself must be, and calls to be, modified by the terms of this court's decision.

**2. Injunctions must be specific in terms and must be narrowly tailored to remedy a specific harm shown.**

Federal Rules of Civil Procedure Rule 65(d) requires that every injunction "shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ."

"The specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Schmidt v. Lessard, 414 U.S. 473, 94 S.Ct. 713 (1974). See also NBA Properties v. Gold, 895 F.2d 30 (1st Cir. 1990). "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." Schmidt v. Lessard, 414 U.S. at ____.

Injunctive relief must be narrowly tailored to remedy the specific harm shown. Aviation Consumer Action Project v. Washburn, 535 F.2d 101 (D.D.C. 1976). Furthermore, relief in equity is remedial, and not penal. Hartford-Empire Co.v. U.S., 323 U.S. 386, 65 S.Ct. 373 (1945). The terms of the P.I. at this point 21 months later are, we submit, penal, because they are no longer narrowly tailored to remedy any

specific harm [that Plaintiffs can show they are likely to suffer]. Indeed, we aver that the only harm Plaintiff could show at this point is the harm of enduring normal competition from those wishing to enter the same market. Other harms show back in April 2004 depended on facts that were by their very nature perishable, and not necessarily permanent and unchanging.

Should any terms become unlimited in time, Defendants would be subject to motions for contempt years from now, and this court would be required to entertain such motions. Defendants submit that in fact there is no good reason to issue any injunction in this case that remains in effect more than two years.

The four criteria used to determine whether or not preliminary injunctive relief is proper are (1) likelihood of success on the merits, and (2) a significant risk of irreparable injury, (3) the balance of hardships weighs in Plaintiff's favor (especially, the hardship of the nonmovant if the restraint is issued as compared to the hardship which the movant will suffer if denied relief), and (4)injunction will not harm the public interest. Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1 (1st Cir. 1999).

These factors, considered at the time the court granted the preliminary injunction, need to be re-examined before this court can enter the same or similar order as permanent relief. The authority to issue injunctive relief is limited and "public policy counsels against use of the Court's equitable powers for injunctive relief in the absence of irreparable harm." Merrill Lynch Pierce Fenner & Smith v. Bennert, 980 F.Supp. 73, 76 (D.Me. 1997). This is so even in case there was a contractual agreement by defendant to the relief sought by plaintiff.

A court may refuse to enjoin defendant from solicitation of its former employer's clients, despite a contractual promise that defendant consented to such injunctive relief. The Plaintiff had failed to prove irreparable harm and the contractual consent could not substitute for the court's own findings.   Merrill Lynch Pierce Fenner & Smith v. Bennert, 980 F.Supp. at ___.  In this case, MassTech has proffered no evidence whatsoever to prove irreparable harm to it at this juncture.

A court must read any ambiguities or omissions in an unclear, vague court order as redounding to the benefit of the person charged with contempt.   NBA Properties, Inc. v. Gold, 895 F.2d 30  (1st Cir. 1990); Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991).

In NBA Properties Inc. v. Gold, the parties executed a settlement agreement.  The First Circuit reversed a finding of contempt where the defendants themselves had not performed the accused actions and the decree did not specifically hold defendants responsible for policing their franchisees.

The injunction itself, should it become permanent, is not tailored to fit the potential harm to Plaintiff but rather is used as a weapon to prevent any competition from the Defendants' business.   The terms of the P.I. at this point 21 months later are penal, because they are no longer narrowly tailored to remedy any specific harm that Plaintiffs can show they are likely to suffer under present circumstances.  Indeed, we aver that the only harm Plaintiff could show at this point is the harm of enduring normal competition from those wishing to enter the same market.

The injunction presently in place also is not specific enough to give Defendants fair notice of what is and is not prohibited to them.  Defendants further state that term (a)

of present injunction is too broad and vague.   The language does not clearly state that only secret or proprietary information belonging to Plaintiff is at issue.

Plaintiff states in its Motion for Judgment regarding term (c) that Curran's "limited obligation is not to solicit business from MassTech's customers and contacts as of April 2004."   However, the Plaintiff refuses to provide a list of such customers and contacts, and in addition, the P.I. does not delimit the prohibited customers and contacts to that time frame – term (c) is actually unlimited and undefined in any way.   Plaintiff should be estopped from claiming any customers and contacts added after the date of the entry of the P.I.   Furthermore, the word "contacts" is inherently ambiguous.

Plaintiff also states that Kevin Curran and Marketplace apparently do not sell databases of high-tech companies.   Whether or not this is true, the P.I. does not so delimit the type of database that Robert Curran with which may be involved.  Nor should it matter whether any of the defendants already do something; the issue is, why should they be restricted in their future endeavors, including both employment and self-employment?  Plaintiff's motion attempts to read narrowness and reason into the language of the P.I., but the Order is not so narrowly tailored.  And if the Order becomes permanent and expands to cover additional defendants, the Order would be even more onerous.

The Settlement Agreement calls for Plaintiff to dismiss Marketplace from this case if Marketplace agrees to the following language at Par. 4:  "neither it, nor any of its officers, directors, employees or agents, nor anyone else acting on its behalf, will at any time sell, offer for sale, market, promote, or incorporate into any product, any data derived from any database owned in whole or in part by Plaintiffs or any of their affiliates

or subsidiaries." This language might be intended to mean that Marketplace also agrees not to use the "confidential" or "proprietary" information from Plaintiff's database. However, the language is far broader and prohibits use of "any data derived from any database" of Plaintiffs. There are two problem with this language. First, this imposes an unlimited obligation on Marketplace to forever obtain and scan Plaintiff's database products to be certain that there is no overlap of "any data". Since "data" is an undefined term that is simply the plural of datum, this could include the name and address of MassTech itself, or the phone numbers of two prominent Massachusetts companies. The term is undefined and devastatingly broad. This clause is not subject to an injunction being issued, but the court should ask Plaintiff to agree that the term "proprietary" or "confidential" should be inserted. It is improper for Plaintiff to attempt to lock up all conceivable data and remove it from Marketplace's use forever. The term is unconscionable. Defendants argue that this clause is a per se violation of the Sherman Act, due to its sweeping anti-competitive provisions (see infra, section II(D), and the fact that this clause is not reasonably related to legitimate interests of Plaintiff. However, as Defendants propose, this term could also be modified to restrict its term to two years from entry of the T.R.O. or from filing of the Amended Complaint.

In the present case, both Settlement Agreement and Preliminary Injunction lack clarity in terms of what conduct is prohibited to some or all Defendants. NBA Properties, Inc, 895 F.2d at 34. Because of the greater significance and the more serious consequences that the law attaches to violation of a court decree, it imposes requirements that the decree be specific, and it refuses to read ambiguities against a defendant. Id.

**3. This court can, and should, either modify the Injunction or dissolve it altogether.**

Modification of decrees or orders is in the inherent power of the court.    Food Fair Stores Inc. v. Food Fair, Inc., 177 F.2d 177 (1st Cir. 1949)(citations omitted).  See also U.S. v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460 (1932).   "[A] court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." U.S. v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460 (1932), quoted in Food Fair Stores Inc. v. Food Fair, 177 F.3d at 186.

In a suit to enjoin violations of anti-trust laws, the court could not impose penalties in the guise of preventing future violations.   A decree enjoining future violations of anti-trust laws, "must not be 'so vague as to  put the whole conduct of defendants' business at the peril of a summons for contempt', enjoin 'all possible breaches of the law', or cause the defendants thereafter not to be under the protection of the law of the land."  Hartford-Empire Co.v. U.S., 323 U.S. at ___  (citations omitted). Where defendants had violated anti-trust laws, provision of decree requiring that each defendant must forever abstain from leasing a patented machine, and take other actions, was unauthorized and was too sweeping, and decree was required to be modified.  Id.

Even in cases where a court is asked to modify a final judgment, F.R.Civ.P 60(b)(5) provides for relief from a judgment when "it is no longer equitable that the judgment should have prospective application."  See, Alexis Lichine & Cie  v. Sacha A. Lichine Estate Selections, Ltd., 45 F.3d 582, 586 (1st Cir. 1995).  MassTech is requesting perpetual prospective application of unconscionable terms.

The settlement agreement cannot mandate that injunctive relief must be given to the Plaintiff.   "It is against public policy to allow the parties to abrogate by contract a

public policy-based limitation upon the exercise of the Court's equitable jurisdiction."
"Parties cannot insulate their requests for equitable relief from court scrutiny by the applicable standards."   Merrill Lynch Pierce Fenner & Smith v. Bennert, 980 F.Supp. 73, 76 (D.Me. 1997).

Plaintiff, in its Motion for Judgment, characterizes the Preliminary Injunction's terms as forbidding Defendants (in reality, the Injunction only governs Robert Curran) from clause (a) "further use or dissemination of MassTech's confidential information," clause (b) "altering data on computer or data storage devices, or " clause  (c) "soliciting MassTech's customers."   The actual language of term (a) is vaguer and broader, as it reads:

> "from further use or dissemination of any database, customer list, or other confidential information and/or trade secrets of MTC"

Plaintiff should be estopped from claiming that the language in (a) prohibits the Defendants from gathering information that is not confidential or proprietary from any and all sources or putting such data into a new database offered by the Defendants or any one of them.

This Court should not enter a permanent injunction forbidding any of the defendants from altering data on computer or data storage devices (paraphrase of P.I. term (b)).  This term should be eliminated, particularly since it offers no protection of any kind to Plaintiff, none of the Defendants have access to any computers of Plaintiff, and the term was appropriate only as a temporary "freeze" of status at the start of this litigation, enabling evidence to be preserved for discovery.   If judgment is to enter, then Plaintiff can have no further interest in what may or may not be contained on computers or storage devices of the Defendants.

Clauses (b) and (c) of the P.I. should not be included in any permanent injunction for all the reasons discussed.

Clause (a) of the P.I. presents a different problem.  Defendants believe that any interest Plaintiff has in avoiding irreparable harm has nearly if not totally dissipated, and that a term of two years from the entry of the preliminary injunction is more than enough protection for Plaintiff.   However, in the event this Court does not agree, Defendants argue that clause (a) should be clarified and narrowed.   The phrase "customer list" should be deleted, since that is covered by clause (c) and since Plaintiff has never produced the alleged customer list and has refused to provide it in aid of enforcement of the Preliminary Injunction.  The term (a) should instead read as follows

> From further use or dissemination of MassTech's confidential information from MassTech's database, excluding independently collected data which are available publicly through a different source such as company websites, annual reports, and other sources not proprietary to MassTech and which may in fact overlap with data collected by Mass Tech.

**B.   The Settlement Agreement at Issue fails as a contract on several grounds including Failure of Consideration and ambiguity, and must be modified**

"A court, in the exercise of its equitable discretion, typically rescinds an agreement only upon a showing of fraud, accident, mistake or some type of grossly inequitable conduct which renders the contract void *ab initio*." P.L.A.Y., Inc. v. Nike, Inc. 1 F.Supp.2d 60, 65 (D. Mass. 1998).

The doctrine of mutual mistake allows the adversely affected party to void the contract at his election because there has been no "meeting of the minds." Beaudette v. Sentry Insurance A Mutual Co. 94 F.Supp.2d 77 (D. Mass. 1999) (quoting LaFleur v. C.C. Pierce Co. Inc., 398 Mass. 254, 496 N.E.2d 827, 830 (1986).   Even where the basic scope of a settlement agreement is agreed upon, if no "meeting of the minds" occurred

14

with regard to essential terms, then no enforceable agreement is formed.  <u>Aegis v. Finnegan and Ixion, LLC</u>, 2002 WL 225924 (D.Mass. 2002).

"A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation…, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." <u>Beaudette</u> at 144.  Defendants' actions were in good faith, as evidenced by their provision of required records to Plaintiff, and their attempts to negotiate per the Court's July 2005 order.

"The parol evidence rule is no bar to the consideration of extrinsic evidence of intent when mistake is alleged." <u>Beaudette</u> at 143. quoting <u>Mickelson v. Barnet</u>, 390 Mass. 786, 460 N.E.2d 566, 569 (1984).  "[W]here the language of a contract 'does not reflect the true intent of both parties, the mutual mistake is reformable." <u>Beaudette</u>, 94 F.Supp.2d at 143, quoting <u>Polaroid Corp. v. Travelers Indemnity Co.</u>, 414 Mass. 747, 610 N.E.2d 912, 917 (1993).  Defendants move separately for reform of the contract.

A contract was determined unconscionable and unenforceable when "the sum total of its provisions drives too hard a bargain for a court of conscience to assist." <u>Campbell Soup Co. v. Wentz</u>, 172 F.2d 80, 84 (3d Cir. 1948).

A unilateral mistake may provide the basis for avoiding a contract where " 'the other party had reason to know of the mistake or his fault caused the mistake.' " <u>First Safety Fund Nat'l Bank v. Friel</u>, 23 Mass.App.Ct. 583, 588, 504 N.E.2d 664 (1987)(citation omitted).

Additionally, there is a failure of consideration.  The Settlement Agreement, instead of ending the dispute, broadens and reopens it, purports to add a new defendant to the

injunction that currently governs only Robert Curran, places severe restrictions on Marketplace's ability to use even publicly-available information, and has no time limits, in effect expanding the injunction far beyond the scope intended by the court when entering it as a preliminary injunction.

When an instrument under seal promises consideration, failure of consideration can be shown despite the seal.  Thomas v. Webster Spring Co., 37 Mass.App. Ct. 180, 638 N.E.2d 51 (1994).

In <u>Cozza v. Network Assoc., Inc.</u> 2005 WL 1377877 (D. Mass. 2005), plaintiff argued that a settlement agreement was unenforceable because the terms were ambiguous. Court disagreed, saying settlement agreement was "a well written, fully-integrated contract carefully molded on the contours of [a previous license agreement], which explicitly defined all essential terms while laying out the exact scope of the license and the parties' respective rights and obligations." <u>Id.</u> at 4.   The case at bar is completely different.   As explained, the incorporation of the P.I. into the settlement agreement makes the settlement agreement ambiguous, because the P.I. itself is ambiguous.

"Agreements, especially commercial arrangements, are designed to make sense. If one reading produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result (e.g., windfall gains, conditions that cannot be satisfied, dubious incentives)." <u>Id</u>. at 3, (quoting <u>National Tax Inst., v. Topnotch at Stowe Resort and Spa</u>, 388 F. 3d 15, 19 (1st Cir. 2004).

Under Massachusetts law, a contract term is ambiguous when its language is "reasonably prone to different interpretations" or "susceptible to differing, but

nonetheless plausible, constructions." <u>Lanier Professional</u>, 192 F.3d at 3 , quoting <u>Alison H. v. Byard</u>, 163 F.3d 2, 6 (1st Cir.1998).

Extrinsic evidence is admissible to assist the factfinder in resolving the ambiguity, including evidence of, in descending order of importance:  (1) the parties' negotiations concerning the contract at issue;  (2) their course of performance;  and (3) trade usage in the relevant industry.  See <u>Den Norske Bank AS v. The First Nat. Bank of Boston</u>, 75 F.3d  49, 52-53 (1st Cir. 1996) ;  see also <u>Keating v. Stadium Management Corp.</u>, 24 Mass.App.Ct. 246, 508 N.E.2d 121, 123 (1987).    The resolution of the ambiguity turns on the parties' intent, as "discerned by the factfinder from the circumstances surrounding the ambiguity and from such reasonable inferences as may be available." <u>Colasanto v. Life Ins. Co. of N. Am.</u>, 100 F.3d 203, 211 (1st Cir.1996).

Even assuming that a party signs a nondisclosure agreement, "[s]uch an agreement cannot make secret that which is not secret...'" <u>Lanier Professional</u>, 192 F.3d at 5.

The Settlement Agreement is ambiguous.  The court should look at the circumstances (extrinsic evidence) to find that the term regarding duration is missing and that a term of two years is appropriate.   The Court should find that the parties were under a mutual mistake, or that Defendant's unilateral mistake is cognizable and that therefore the contract must be modified.  The absence of consideration due to the Agreement's failure to actually end the controversy on clear terms, also justifies modification of the Agreement.  Moreover, mistake is the only way a party would execute an agreement including terms that are clearly impossible to perform, as in this case.   Additionally, the Court should find that paragraph 4 of the Agreement is unconscionably broad and that only proprietary portions of Plaintiff's database cannot be used by Marketplace.

**C.  The Settlement Agreement also is a Non-competition Agreement that contains terms that are against public policy, vague, and unconscionable.**

MassTech's Motion for Judgment claims that the provision in the preliminary injunction forbidding Robert Curran from soliciting MassTech's customer's or contacts is not a non-competition agreement. This is simply not true. Although formulated post-employment, the non-solicitation provision in the preliminary injunction (term "c") is nevertheless a serious impediment to employment and to self-employment.  Contrary to MassTech's claims, the provisions, if made permanent, would severely limits the employment opportunities of all the defendants in three important ways: 1) Defendants have no way of knowing whom exactly they are not allowed to solicit; 2) There is no limitation as to the context in which non-solicitation is limited; and 3) There is no temporal or geographic limit on non-solicitation.

Even if the non-solicitation provision is not analyzed in the employee/employer context, it is still unconscionable and unenforceable.  Unconscionability is a question of law.  Carvel Corp. v. Eisenberg, 692 F.Supp. 182 (S.D.N.Y. 1988).  This Court can find that Settlement Agreement's paragraph 4 as to Marketplace, is unconscionable, since it effectively prohibits Marketplace from ever using data that happen to coincide with Plaintiff's data, even publicly-available facts such as published phone numbers.

MassTech would like the court to believe that because the non-solicitation provision came into being post-employment, that it therefore is outside the scope of employee/employer. MassTech's Motion for Judgment claims that the restrictions incorporated into the settlement agreement go beyond MassTech's "intangible concerns about good will and confidential information, but also its interests in obtaining

compensation for Curran's wrongdoing." Defendants urge the court not to accept such blatant obfuscation. No "wrongdoing" by the defendants has been either admitted or proven in this case. In fact, the settlement agreement itself does not support such a claim. The settlement agreement was signed by the defendants to make this litigation go away, not to give credence to any of MassTech's allegations.  No matter the context, the court must consider MassTech's attempt to disguise a permanent non-competition agreement as a run-of-the-mill settlement agreement. This court should not be party to the enforcement of unconscionable, anti-competitive terms.

MassTech's restraints on the defendants should not be greater than necessary to protect their legitimate interests. See Kroeger v. Stop & Shop Companies, Inc., 13 Mass.App., 432 N.E.2d 566, 570 (1982). In Kroeger, the court found that a non-competition agreement lasting for the former employee's lifetime reached well beyond the employer's legitimate interests, and upheld the lower court's restricting the non-compete to one year. Id. at 571. Non-competition agreements must be reasonable in scope with respect to both geography and duration, and must be consonant with the public interest. Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 815 N.E.2d 572 (2004). See also, Marine Contractors Co. v. Hurley, 310 N.E.2d 915 (Mass. 1974).

In the employee/employer context, non-competitive restrictions on employee may be enforced, whether by injunction or by award of damages, but are limited to the territory in which employee had actual contact with established relations between employer and those customers. All Stainless, Inc. v. Colby, 364 Mass. 773, 308 N.E.2d 481 (1974);  Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 310 N.E.2d 915 (1974). See also National Hearing Aid Centers, Inc. v. Avers, 2 Mass.App.Ct. 285, 311

N.E.2d 573 (1974)(citation omitted): "An employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of the employment. The employee may achieve superiority in his particular department by every lawful means at hand, and then, upon the rightful termination of his contract for service, use that superiority for the benefit of rivals in trade of his former employer."

The same considerations used to determine the reasonableness of a covenant restricting trade or competition should also influence the terms of injunctions granted to prevent trade secret violations. Analogic Corp. v. Data Translation, Inc., 371 Mass. 643, 647, 358 N.E.2d 804, 807 (1976). Courts may appropriately consider these requirements when they exercise their equitable discretion to restrict unfair competition. Analogic, 358 N.E.2d at 807. Clearly, the restrictions in the injunction are contrary to every test used to determine the enforceability of these types of restrictions. The injunction provision has no geographical or temporal limitation. These factors alone are enough to bar the extension of the preliminary injunction into a permanent injunction as required by the settlement agreement. See Whitinsville Plaza v, Kotseas, 390 N.E.2d 243, 252 ( Mass. 1979). Even the court in Wells v. Wells, 9 Mass.App.Ct. 321 (1980), cited by MassTech in its Motion, found a restraint unlimited in time to be unreasonable.

Robert Curran has already been subjected to serious restrictions for almost two years, since the beginning of this litigation in late March, 2004. The restraint requested by MassTech must be consistent with the protection of MassTech's goodwill. See All Stainless, Inc., supra, 308 N.E.2d at 486-87. Even if the allegations against the defendants were true, the protection of MassTech's goodwill certainly does not require what amounts

to a perpetual agreement not to contact MassTech's "customers or contacts" in any context without a time limitation on the restriction. Such an order would amount to a "gag order" that could violate Defendants' First Amendment rights.

Any possible damage to MassTech's goodwill has long since faded during the course of this litigation and defendants should not be restricted from engaging in competition in the free-market. In fact, even if MassTech had a legitimate interest in restraining the defendants from competing, that interest had a "limited shelf life." Kroeger, 432 N.E.2d at 570. The shelf life of MassTech's good will with regard to the information they claim defendants misappropriated has long since expired, especially considering the data collected by MassTech appears to be entirely publicly available, and simply repackaged by MassTech. MassTech's true fear is competition, not the misappropriation of any trade secrets or proprietary portions of its database.

It is in the public interest to allow an individual to participate in his or her trade freely, and interference with individual liberty of trade is contrary to public policy. See Woolley's Laundry v. Silva, 304 Mass. 383, 387, 23 N.E.2d 899, 901 (1939). The fact that the injunction does not have a contextual limitation in the non-solicitation provision amounts to restricting the defendants from contacting MassTech's customers or contacts for any reason, not solely in relation to the sale of certain types of databases. If one of the defendants wished to contact one of MassTech's customers or contacts to sell real estate, this would be a violation of the injunction. Moreover, it is not clear from the plain language of the injunction whether or not defendants could gather data independently, with or without keeping detailed records of the source of their collected data.

It is also significant that the defendants have no idea who exactly are the "customers and contacts" they are forbidden to solicit. A restriction on a former employee's right to use an alleged trade secret which is not such in fact or in law, is unenforceable against public policy. Dynamics Research Corp. v. The Analytic Sciences Corp., 9 Mass. App. Ct. 254, 287; 400 N.E.2d 1274, 1288 (1980). See also Lanier Professional, 192 F.3d at 5. In Dynamics, plaintiff took inadequate precautions as to the alleged trade secret, and failed to put employee on notice as to trade secrets; therefore, plaintiff's inadequate precautions did not warrant relief. 400 N.E.2d at 277. Similarly, in the case at bar, MassTech is alleging misappropriation of trade secrets, when in fact, Robert Curran was never asked to sign a non-competition agreement or any recognition of trade secrets or confidential information. And now, rather than providing a list of customers and contacts that defendants are forbidden to contact, MassTech prefers to be vague and hope to attack any business that defendants may engage in. In the context of trade secrets, the absence of a non-competition agreement signed during employment can favor a finding that a preliminary injunction is against public policy. See Campbell Soup Company v. Giles, 47 F.3d 467, 469-70 (1st Cir. 1995).

MassTech claims that since the restrictions do not arise under the traditional framework of a non-comeptition/non-solicitation agreement signed while the former employee was still employed, that the overbroad provisions in the injunction are not subject to the same scrutiny. This court should not be party to giving more than full effect to the injunction currently in place. If the court grants MassTech's Motion, it will, for the foregoing reasons, be placing an unreasonable restraint on the defendants. Reluctance to

give full effect to post-employment restraints has a long history in the law. Kroeger, 432

N.E.2d at 568 (lifetime non-compete limited by court to one year).

"If the covenant [not to compete] is too broad in time, in space or in any other

respect, it will be enforced only to the extent that it is reasonable and to the extent it is

severable for the purposes of enforcement." All Stainless, 308 N.E.2d at 485. Making the

current injunction permanent, as MassTech desires, would in essence create a non-

competition agreement that is infinite in time, space, and context.  Reasonable

enforcement of the restrictions has already run its course for almost two years.

Since the non-solicitation provision contains ambiguous terms, it may be

construed against the drafter. See Lanier Professional, 192 F.3d at 10.  The court may

look to extrinsic evidence to resolve such ambiguity. Id. at 7. Since MassTech is

attempting to incorporate the injunction into the settlement agreement, and since the TRO

and P.I. incorporated all material terms of MassTech's suggested language for the TRO,

it should be considered the "drafter" of the restriction. Moreover, the fact that the parties

engaged in negotiations (ordered by the court) regarding the terms of the restrictive

provisions in the injunction after the settlement agreement was executed, plus Plaintiff's

counsel's letter of October 20, 2004 (Docket No. 13)  shows that there were

acknowledged ambiguities and problems with the injunction.

**D.   The settlement agreement including the language of the present
preliminary injunction is so broad and vague that it may be a per se violation of
anti-trust law, and therefore void or voidable.**

The Settlement Agreement is an unjustified restraint of trade.  Defendants assert

that it is a per se violation of the Sherman AntiTrust Act, therefore the contract is void or

voidable.  The fact that Defendants earlier signed such agreement does not matter.

Courts "have refused to permit a party to benefit from contractual rights when the contract is an instrument of restraint of trade." Milsen Co. v. The Southland Corp., 454 F.2d 363, 368-69 (7th Cir. 1972)

Agreements "whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality . . . are 'illegal per se.'" National Society of Professional Engineers v. U.S., 435 U.S. 679, 692 (1978). The unreasonableness of restrictions "could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices." Id. at 690.

"[C]ase-by-case analysis is unnecessary when the restraint falls into a category of agreements which have been determined to be per se illegal. Such agreements are those that are 'always or almost always tend to restrict competition and decrease output.'" U.S. v. Brown , 936 F.2d 1042, 1045 (9th Cir. 1991). A market allocation agreement, which restricted each billboard company's ability to compete for the other's billboard sites, was per se illegal under the Sherman Anti-Trust Act. Id., 936 F.2d 1042, 1045. Not only would the Settlement Agreement restrict competition in MassTech's industry, it would restrict defendants in all industries due to its overbreadth.

"[A] covenant not to compete does not violate the Sherman Act, as long as the covenant is reasonably related to legitimate interests of one of the parties. This test is known as the 'rule of reason' approach." Carvel Corp., supra, 692 F.Supp. at 185. For a restrictive covenant to be unconscionable, it must be unconscionable with respect to (1) geographic scope and (2) temporal duration. Id. at 186. "[S]uperior bargaining power on the part of the plaintiffs standing alone is not enough to prove unconscionability."

Absence of a meaningful choice must be accompanied by 'contract terms which unreasonably favor the other party.'" Id.

Nor do intellectual property rights exempt the owner from the antitrust law. "It is well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly." U.S. v. Line Materials Co., 333 U.S. 287, 68 S. Ct. 550 (1948).

Defendant submits that the Settlement Agreement, particularly in paragraph 4 and as intended to include the language of the P.I., is unrelated to any legitimate business interest of Plaintiff and operates to restrain trade. Therefore, the agreement is a per se violation of the Sherman Act.

### E.   Other equitable and practical Considerations Support Defendants' Position that the Settlement Agreement ought to be modified and any Injunction Limited in Scope and in Time

Numerous equitable considerations in the circumstances of this case should limit the awarding of serious permanent injunctive relief to this Plaintiff.

Plaintiff wishes to enforce term (c) of the P.I. permanently, yet refuses to provide the list of customers and contacts that Defendants must refrain from contacting. This is patently unfair and would leave Defendants in such doubt that they would virtually be unable to conduct their business or any similar business. The only viable interpretation of Plaintiff's refusal to provide the list is that they wish Defendants to be in doubt about who they may or may not contact, including inadvertent contact at, for example, a trade show or even on the street. Requiring that Plaintiff provide the list would ensure that term (c) of the P.I. is obeyed, and would actually make any proof by Plaintiff of contempt by Defendants easier. At present, term (c) may be close to unenforceable.

The passage of time since Robert Curran's departure from Plaintiff's employment must be considered.   The customer list might be proprietary but such list undoubtedly changes over time.  There is no justification in the law for barring Defendants from ever soliciting persons or entities who happen to have purchased Plaintiff's product in the past; in fact, such a prohibition appears to be a violation of the anti-trust law.  Plaintiff has been adequately protected for the past 21 months.

Term (b) of the P.I. ought not to apply to these defendants at all – if the litigation is ending, Plaintiff can have no interest in the preservation of any of Defendants' computers.   These defendants no longer stand accused of possessing any secret or proprietary items belonging to Plaintiff.   It is onerous to so order, over twenty-one months after the original Order, going forward permanently.

Plaintiff by its actions has acknowledged that Defendants have not sold any database that violates any proprietary rights of Plaintiff or any terms of the P.I.   This is evident from Plaintiff's acknowledgment that no supplemental payment was due under the terms of the present Settlement Agreement.    It is unreasonable to accord protection to non-proprietary portions of Plaintiff's product.

Plaintiff seeks legally to block Marketplace from offering any database that overlaps with or contains data in common with Plaintiff's database, even publicly available data such as published phone numbers.  Plaintiff seeks legally to block Defendants from offering any database that is at all similar to Plaintiff's 2004 product, and possibly all current and future databases, rather than merely to protect Plaintiff's proprietary material in as of the time Plaintiff filed its Complaint.  The language of the P.I. at present is broad enough that Plaintiff might choose to bring a motion for contempt

should Defendants <u>ever</u> issue a high-technology database.   This imposes an onerous and unjustifiable burden on Marketplace.   This burden is actually greater than that imposed in term (a) of the P.I.

Plaintiff's failure to have Robert Curran sign an agreement regarding post-employment competition and solicitation indicates that Plaintiff is not particularly concerned about proprietary rights in its database.  Nor has Plaintiff ever introduced evidence of any trade secrets.  Despite its copyright claim, Plaintiff has never registered copyright in the database that is the subject of this action.  Together with Plaintiff's refusal to agree to a reasonable term limit for any part of the P.I., it is clear that Plaintiff's goal is simply to block any possibility that the Defendant may conduct any number of businesses, regardless of whether such business actionably harms Plaintiff.

### III.  Requested Relief

Wherefore, Defendants ask that this Motion for Judgment be denied under the terms proposed by Plaintiff, and that this Court grant declaratory relief to Defendants in the terms proposed in the attached Motion for Declaratory Relief.

### <u>REQUEST FOR ORAL ARGUMENT</u>

Defendants request oral argument on Plaintiff's Motion for Judgment.


Respectfully submitted,

**/s/ Lucy D. Lovrien**
Lucy D. Lovrien, Attorney at Law (BBO No. 555042)
Ten Winthrop Square
Boston, Massachusetts 02110
Phone: (617) 423-4050
Fax: (617) 617-426-5251

Dated: January 19, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 19, 2006.

**/s/ Lucy D. Lovrien**
Lucy D. Lovrien